IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SAMUEL L. KIMBRIL,<br><br>            Plaintiff,<br><br>    vs.<br><br>SOURCE MEDIA, LLC, and LYNNLEY BROWNING,<br><br>            Defendants. | **8:22CV401**<br><br><br>**MEMORANDUM AND ORDER** |

This is an invasion-of-privacy, defamation, slander, and slander-per-se case in which Plaintiff, Samuel L. Kimbril, claims that Defendants, Source Media, LLC ("Source Media") and Lynnley Browning, wrote and published an online article which contained false, libelous, and defamatory statements about him, as well as statements that invaded his right to privacy. *See generally* Filing No. 1-1. It comes before the Court on Defendants' motion to dismiss for failure to state a claim. *See* Filing No. 8. For the reasons stated herein, the Court denies Defendants' motion to dismiss as to the claims under defamation, slander, and slander per se and grants Defendants' motion to dismiss as to Neb. Rev. Stat. § 20-202, Neb. Rev. Stat. § 20-203, and Neb. Rev. Stat. § 20-204.

## I.    BACKGROUND

On October 17, 2021, defendant Source Media published an article on the website "financial-planning.com" written by defendant Browning titled "'Serial killer-level crazy': Former Ameritrade advisor wages war against Schwab with allegations." *See* Filing No. 1-1 at 3; Filing No. 10-1; Filing No. 10-3. The article chronicles Cortney Kotzian's time as

an employee for TD Ameritrade ("TD") in Omaha, Nebraska, and her interactions with Kimbril, her coworker.  *See* Filing No. 10-1.

The article describes several alleged workplace interactions between Kotzian and Kimbril beginning with Kotzian's job interview at TD in November 2018 and concluding with Kimbril's departure from TD in May 2020.  *See generally* Filing No. 10-1.

According to the article, Kotzian stayed late after her first day of work to organize her desk.  Filing No. 10-1 at 5.  Kimbril also stayed late.  *Id.*  According to Kotzian, "[Kimbril] came over and cornered me in my cubicle," adding that "I couldn't leave [the cubicle] without pushing [Kimbril] aside]."  *Id.*  A few days later, Kotzian's then-fiancé brought Kotzian a flowering plant for her desk.  *Id.*  According to the article, Kimbril would visit Kotzian's desk to "touch the plant" and once remarked that "it's against the rule [sic] to have potted plants on the desk."  *Id.*  Kotzian stated that she checked TD's employee manual and discovered that there was no rule against having potted plants on an employee's desk.  *Id.*  According to the article, Kimbril continued to visit Kotzian, "asking on several occasions if she had watered the plant and whether it was getting enough light."  *Id.*  Kotzian concluded that Kimbril's concern regarding the plant "was just a reason to talk to me."  *Id.*  A few months later, Kotzian returned from a vacation to find her plant missing.  *Id.*  Kimbril admitted to taking the plant home and photographing it.  *Id.*

In December 2018, TD employees wore "ugly festive sweaters" to work.  Filing No. 10-1 at 5.  Kotzian wore a "gray crewneck top with red and white sequins that spelled out 'naughty' or 'nice,' depending on how [Kotzian] had flipped [the sequins] on the front."  *Id.*  Kotzian stated that she felt like Kimbril was watching her: "[Kimbril] was lurking around, trying to chat with me, and was staring at me."  *Id.*  At one point, Kimbril asked if Kotzian's

sequins moved, and reached over to touch them.  Kotzian's manager "quickly shooed [Kimbril] away."  *Id.*  Following this interaction, Kimbril's junior colleagues "urged her to report the holiday sweater episode to [human resources]" but "senior colleagues told her to keep quiet."  *Id.* at 6.  Kimbril's manager told Kotzian to "just tell [Kimbril] to back off and not touch you."  *Id.*  Kotzian remarked that Kimbril's manager was "coaching [Kotzian] to train him like a puppy."  *Id.*  Kotzian stated that her direct manager "'warned [Kotzian] not to complain about [Kimbril], because when other people had done that,' another manager had 'made their life more difficult.'"  *Id.*

In November 2019, Kotzian decided not to participate in the company-wide "wear a hoodie to work" day, and instead wore a dark blue plaid shirt to work.  *Id.*  Kimbril noticed Kotzian's non-participation in "wear a hoodie to work" day and asked Kotzian "couldn't you borrow one from the man you live with?" to which Kotzian responded, "I'm not borrowing his clothes."  *Id.*  Kimbril then asked Kotzian, "well, what kind of clothes do you have?" and subsequently suggested that Kotzian buy a TD-branded hoodie from the online TD store.  *Id.*  According to the article, after Kotzian refused, she told Kimbril that "you cannot make me wear a hoodie," and Kimbril responded that "yes, I can [make you wear a hoodie] . . . I can get your address out of [TD's internal employee directory] and come to your house on Friday."  *Id.*, 7.  "I'm going to zip tie you to a dining room chair, take off your shirt and dress you in a hoodie."  Filing No. 10-1 at 7.  Kotzian stated that she was shaken following Kimbril's statement.  *Id.*  Kotzian responded by telling Kimbril that he "crossed the line," that his words were "extremely creepy," and that he needs to "leave [her] alone."  *Id.*  In the months following "wear a hoodie to work" day, Kotzian remarked that Kimbril continued to follow Kotzian around, trying to high-five Kotzian, often

squeezing and poking Kotzian's shoulder, and generally being "very hands-y." *Id.* Kimbril also began using the paper shredder near Kotzian's desk, as opposed to the one near his own desk. *Id.* Kimbril's choice to use the paper shredder near Kotzian's desk prompted Kotzian and a female colleague to alert corporate security, who observed, through security cameras, that Kimbril would touch objects on Kotzian's desk while Kotzian was away. *Id.*

In February 2020, maintenance workers rearranged the desks in Kotzian and Kimbril's work area. *Id.* When the desks were rearranged, Kimbril was placed at the desk between Kotzian and another coworker whom Kotzian alleges "has also reported [Kimbril] for sexual harassment." Filing No. 10-1 at 7, 8. Following the desk rearrangement, Kimbril moved his desk so that it faced both Kimbril and the other coworker. Filing No. 10-1 at 8. As a result of Kimbril moving his desk, a glare from the window was cast onto his computer screen. *Id.* Kotzian's coworker remarked the glare to Kimbril, stating "you can't even see your computer screen!" to which Kimbril replied "yeah, but I can see everything else better." *Id.*

In addition to describing alleged workplace interactions between Kotzian and Kimbril, the article makes several statements with respect to Kimbril. The article states that "on July 20, 2016, Kimbril was booked in Omaha's Douglas County jail for sexual assault of a child," and that "Kimbril had been arrested for sexually assaulting a child in 2016," adding that "[t]here's no record of his conviction on the charges" and "Kimbril doesn't appear on Nebraska's sex offender registry." Filing No. 10-1 at 2, 3. Additionally, the article's title includes a quotation from Kotzian which refers to Kimbril as "[s]erial killer-level crazy." Filing No. 10-1 at 1. The article's text includes a full-length version of that

same quotation, where Kotzian states that "threatening a woman, to tie her up, is serial-killer level crazy." Filing No. 10-1 at 3.

On October 13, 2022, Kimbril filed suit against Defendants in the District Court of Sarpy County, Nebraska, alleging they "wrote and published an article containing false, libelous, and defamatory statements" about him as well as statements that invaded his right to privacy. *See* Filing No. 1-1 at 3, 6. The operative complaint lists both Source Media and Browning as Defendants. *See* Filing No. 1-1 at 3. The complaint specifies eight "false and libelous comments" made by Defendants in the article: Kimbril "is serial-level crazy" [sic]; Kimbril harassed Kotzian during their employment; "[a]llegations of an arrest of Mr. Kimbril that place him in a false light;" "[p]ublishing information from usbondsman.com that place Mr. Kimbril in a false light;" "[a]ssertions that Mr. Kimbril should be on a sex offender registry;" "[a]ssertions that Mr. Kimbril might have failed to properly report FINRA information" and claims Kimbril behaved "improperly." Filing No. 1-1 at 4. Additionally, the complaint alleges that Defendants did not undertake an independent investigation to verify the allegations included in the article, that the article references an alleged sexual assault by Kimbril, and that Kotzian obtained "sealed confidential information" regarding those sexual assault allegations. Filing No. 1-1 at 5. The complaint further alleges that the statements made by Defendants are false and that Kimbril "is no longer able to obtain professional employment" because of the article's false statements. Filing No. 1-1 at 6. The complaint finally alleges general damages of $100,000.00 and special damages of $7,750.00 per month, beginning November 1, 2021. Filing No. 1-1 at 6–7. Defendants timely removed the matter to this Court.[1] Defendants

---

[1] This Court has diversity jurisdiction over this matter because the controversy is between citizens of different states and the amount in controversy exceeds $75,000. Plaintiff is a citizen of Nebraska, Defendant

now move to dismiss the complaint against them pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.  Filing No. 8.

## II.    DISCUSSION

Defendants move to dismiss Kimbril's complaint against them, arguing that Kimbril fails to state a claim upon which relief can be granted because the article does not include any defamatory or untrue statements and does not invade Kimbril's privacy.  Filing No. 8.

### A.  Standard of Review

Under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).  In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

Under *Twombly*, a court considering a motion to dismiss may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the presumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Although legal

---

Source Media is a Delaware limited liability company, Defendant Browning is a citizen of Illinois, and Plaintiff seeks "general damages . . . in the amount of $750,000.00 . . . as well as special damages in an amount of $7,750.00 per month beginning November 1, 2021 and continuing thereafter," an amount in controversy in excess of $75,000. Filing No. 1-1 at 7; *see* 28 U.S.C. § 1332.

conclusions "can provide the framework of a complaint, they must be supported by factual allegations."  *See id.* (describing a "two-pronged approach" to evaluating such motions: First, a court must accept factual allegations and disregard legal conclusions; and then parse the factual allegations for facial plausibility).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

### B. This Court May Consider the Article Because it is Necessarily Embraced by the Complaint

As an initial matter, the Court must determine whether it may consider the article even though it was not included in Kimbril's Complaint.  *See generally* Filing No. 1-1.  As a general rule, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is decided based on the allegations of the operative complaint and "'matters outside the pleading' may not be considered in deciding a Fed. R. Civ. P. 12 motion to dismiss."  *Enervations, Inc. v. Minnesota Mining & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004) (quoting *BJC Health Sys. v. Columbia Cas. Co.*, 348 F.3d 685, 687 (8th Cir. 2003)); *see* Fed. R. Civ. P. 12(d). Still, "documents 'necessarily embraced by the complaint' are not matters outside the pleading."  *Enervations, Inc.*, 380 F.3d at 1069 (quoting *BJC Health System*, 348 F.3d at 687).

"Documents necessarily embraced by the pleadings include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading.'"  *Ashanti v. City of Golden Valley*, 666 F.3d 1148 (8th Cir. 2012) (quoting *Kushner v. Beverly Enterprises, Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)).

Defendants filed the article with this Court as an exhibit within an index of evidence in support of Defendants' motion to dismiss. *See generally* Filing No. 10-1. The article is a "document necessarily embraced by the complaint" because the complaint repeatedly discusses and references its contents and is thus not a matter outside the pleading. *See Enervations, Inc.*, 380 F.3d at 1069. Our precedent supports this holding. *See id.* at 1069 (quoting *Piper Jaffray Companies, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 967 F. Supp. 1148, 1152 (D. Minn. 1997) (a termination letter in a breach of contract dispute "clearly was 'necessarily embraced by the pleadings'"); *Ashanti*, 666 F.3d at 1151 (a notice and a letter that accompanied the notice "were alleged in the complaint and thus necessarily embraced by the complaint"); *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (affirming the district court's consideration of a contract in a contract dispute, despite the contract being a "matter[] outside the pleadings"). Accordingly, this Court will consider the article in deciding the motion to dismiss because it is necessarily embraced by the complaint.[2]

### C. The Complaint Does Not Adequately State a Claim Upon Which Relief Can Be Granted as to Neb. Rev. Stat. § 20-202

This Court must first consider whether Kimbril has adequately stated a claim upon which relief can be granted as to Neb. Rev. Stat. § 20-202. Section 20-202 provides the cause of action for invasion of privacy by exploiting a person for commercial purposes. Neb. Rev. Stat. § 20-202. "Any person, firm, or corporation that exploits a natural person . . . for . . . commercial purposes shall be liable for invasion of privacy." Neb. Rev. Stat.

---

[2] Defendants' index also included a petition and affidavit to obtain harassment protection order filed by Kimbril against Kotzian following the publication of the article. Filing No. 10-2. Because the protection order application is not embraced by the pleadings, the Court does not consider it in deciding the present motion to dismiss.

8

§ 20-202.  Neb. Rev. Stat. § 20-202(1) provides an exception, specifying that the statute does not apply to "[t]he publication, printing, display, or use of the name or likeness of any person in any printed . . . or other news medium or publication as part of a bona fide news report or presentation or noncommercial advertisement having a current historical public interest and when such name or likeness is not used for commercial advertising purposes."  Neb. Rev. Stat. § 20-202(1).

Nebraska courts have only examined the "commercial purpose" element of Neb. Rev. Stat. § 20-202 once.  *See Wilkinson v. Methodist, Richard Young Hosp.*, 612 N.W.2d 213 (Neb. 2000).  In *Wilkinson*, the Nebraska Supreme Court considered whether hospital employees using a hospital computer system to retrieve a patient's insurance information in order to file a claim for treatment provided to the patient's daughter invaded the patient's privacy in violation of Neb. Rev. Stat. §§ 20-202, 20-203, and 20-204 all relating to various torts of invasion of privacy.  *See id.*  As is relevant here, the court held that the hospital did not exploit the patient's name or likeness in violation of Neb. Rev. Stat. § 20-202.  *Id.* In declining to extend § 20-202 to the facts of the case, the *Wilkinson* court reasoned that "[s]ection 20-202 typically applies to cases in which a photograph or other likeness of a person is distributed without that person's consent for commercial gain," and that the hospital's use of the patient's insurance information to file an insurance claim was not an exploitation of "[the patient's] name or likeness . . . in the sense contemplated by § 20-202."  *Id.*

No Nebraska court has examined the term "bona fide news report" within the context of either Neb. Rev. Stat. § 20-202 or the tort of invasion of privacy, generally.

However, Florida's statute on invasion of privacy via unauthorized publication of name or likeness, Fla. Stat. § 540.08, strongly resembles Nebraska's statute:

> (1) No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without . . . express written or oral consent . . ..
>
>     . . . .
>
> (4) The provisions of this section shall not apply to:
>
> (a) the publication, printing, display, or use of the name or likeness of any person in any newspaper, magazine, book, news broadcast or telecast, or other news medium or publication as part of any bona fide news report or presentation having a current and legitimate public interest and where such name or likeness is not used for advertising purposes . . ..

Fla. Stat. § 540.08.

Several courts have discussed Fla. Stat. § 540.08, focusing on the statute's "commercial purpose" and "bona fide news report" language. In *Loft v. Fuller*, the District Court of Appeal of Florida considered whether the reference to the plaintiff's deceased husband, in a book and movie based on a plane crash in which plaintiff's deceased husband was the pilot, was violative of Fla. Stat. § 540.08. *Loft v. Fuller*, 408 So. 2d 619, 620–21 (Fla. Dist. Ct. App. 1981). In holding that the reference to the plaintiff's deceased husband was not an invasion of privacy as prohibited by Fla. Stat. § 540.08, the *Loft* court reasoned that "while [the court] agree[s] that at least one of the purposes of the author and publisher in releasing the publication in question was to make money through sales of copies of the book and that such a publication is commercial in that sense, this in no way distinguishes this book from almost all other books, magazines, or newspapers and simply does not amount to the kind of commercial exploitation prohibited by the statute." *Id.* at 623 (citations omitted). The *Loft* court added that the statute "is designed to prevent

10

the unauthorized use of a name to directly promote the product or service of the publisher." *Id.* at 622–23. Further, the *Loft* court added that "[w]e simply do not believe that the term 'commercial,' as employed in [Fla. Stat. § 540.08] was meant to be construed to bar the use of people's names in such a sweeping fashion," and that accepting plaintiff's view "would result in a substantial confrontation between this statute and the first amendment to the United States Constitution." *Id.* at 623.

In *Tyne v. Time Warner Ent. Co., L.P.*, the Supreme Court of Florida built on *Loft*, stating that "the purpose of section 540.08 is to prevent the use of a person's name or likeness to directly promote a product or service because of the way that the use associates the person's name or personality with something else." *Tyne v. Time Warner Ent. Co., L.P.*, 901 So. 2d 802, 808 (Fla. 2005). In reaching its decision, the *Tyne* court cited with approval *Ewing v. A-1 Mgmt., Inc.*, 481 So. 2d 99 (Fla. Dist. Ct. App. 1986). The *Ewing* court had held that defendants who published the names and addresses of the parents of a fugitive on a wanted poster did not violate Fla. Stat. § 540.08. *Id.* at 99. It held that "while this use of the plaintiffs' names fell within the scope of [the commercial purpose prohibition of Fla. Stat. § 540.08], the use was exempted under the [bona fide] newsworthiness exemption of [Fla. Stat. § 540.08]." *Tyne*, 901 So. 2d at 808.

In contrast, in *Bilotta v. Citizens Information Associates, LLC*, the United States District Court for the Middle District of Florida considered whether the websites "justmugshots.com" and "mugshots.mobi" that linked website visitors to a fee-based unpublishing service violated Fla. Stat. § 540.08. *See Bilotta v. Citizens Info. Assocs., LLC*, No. 8:13-CV-2811-T-30, 2014 WL 105177, at *1 (M.D. Fla. Jan. 10, 2014). The *Bilotta* court held that the websites did violate Fla. Stat. § 540.08, that publication of the

11

mugshots on the websites were not protected by the First Amendment, and that dismissal of the case was not warranted under Fed. R. Civ. P. 12(b)(6) because the plaintiff alleged the use of her name and image for the commercial purpose of paying a fee to remove the mugshot. *Id.*; accord *Gabiola v. Sarid*, No. 16-CV-02076, 2017 WL 4264000, at *7 (N.D. Ill. Sept. 26, 2017) (finding a plaintiff had stated a cause of action a right of publicity statute "because the plaintiff had sufficiently alleged the use of her likeness (a mugshot) for commercial purposes (the removal of the arrest photo for a fee) as in *Bilotta*").

The above caselaw provides a helpful mosaic for the Court's application of Neb. Rev. Stat. § 20-202 to the case at hand.  In the aggregate, "[c]ourts [examining similar statutes] have interpreted the statute's commercial purpose requirement to require that a defendant's unauthorized use 'directly promote' a product or service." *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1325 (11th Cir. 2006).  Additionally, courts have favored a deferential standard for what qualifies as "commercial purpose" and a broad standard for what is considered a "bona fide news report."  *See generally Loft v. Fuller*, 408 So. 2d 619, 623 (Fla. Dist. Ct. App. 1981) ("While [the court] agree[s] that at least one of the purposes of the author and publisher in releasing the publication in question was to make money through sales of copies of the book and that such a publication is commercial in that sense, this in no way distinguishes this book from almost all other books, magazines, or newspapers and simply does not amount to the kind of commercial exploitation prohibited by the statute."); *Fuentes v. Mega Media Holdings, Inc.*, 721 F. Supp. 2d 1255, 1258 (S.D. Fla. 2010) ("[T]here are a number of Florida cases that hold the use of one's name, likeness, portrait or photograph, whether in a news report, television show, play, novel, or the like is not actionable unless the individual's name or

likeness is used to directly promote a commercial product or service, *separate and apart* from the publication." (emphasis in original)).  In sum, statutes similar to Neb. Rev. Stat. § 20-202 are "designed to prevent the unauthorized use of a name to directly promote the product or service," not to "bar the use of people's names in . . . a sweeping fashion." *Id.*

In his complaint, Kimbril alleges that "[d]efendants published and/or posted personal information about Plaintiff designed for the commercial purposes of monetizing its social media/business accounts in violation of Neb. Rev. Stat. § 20-202." Filing No. 1-1 at 6.  While it is possible that at least one of the Defendants' purposes in publishing the article was to make money, this does not distinguish the article from almost all other news articles available in print or online form and does not amount to the kind of commercial exploitation prohibited by the Neb. Rev. Stat. § 20-202.  Unlike in *Bilotta* and *Gabiola*, where two federal district courts held that websites which displayed mugshots and charged a fee to have those mugshots removed operated for "commercial purposes" within the applicable statutes, the article in this case does not operate primarily to earn revenue but was a bona fide news report.  *See Bilotta*, 2014 WL 105177, at *1; *Gabiola*, 2017 WL 4264000, at *7.  Accordingly, this Court holds that Kimbril has not adequately stated a claim upon which relief can be granted as to Neb. Rev. Stat. § 20-202.

### D. The Complaint Does Not Adequately State a Claim Upon Which Relief Can Be Granted as to Neb. Rev. Stat. § 20-203

This Court must next consider whether Kimbril has adequately stated a claim upon which relief can be granted as to Neb. Rev. Stat. § 20-203. Section 20-203 provides a cause of action for invasion of privacy by intrusion upon a person's solitude: "Any person, firm, or corporation that . . . intrudes upon any natural person in his or her place of solitude

13

or seclusion, if the intrusion would be highly offensive to a reasonable person, shall be liable for invasion of privacy." Neb. Rev. Stat. § 20-203.

Nebraska courts have interpreted Neb. Rev. Stat. § 20-203 narrowly.  In *Kaiser v. Western R/C Flyers, Inc.*, the Supreme Court of Nebraska described the invasion of privacy contemplated by Neb. Rev. Stat. § 20-203 as "consist[ing] solely of an intentional interference with [the plaintiff's] interest in solitude or seclusion, either as to his person or as to his private affairs or concerns, of a kind that would be highly offensive to a reasonable [person]." *Kaiser v. W. R/C Flyers, Inc.*, 477 N.W.2d 557, 562 (Neb. 1991) (quoting Restatement (Second) of Torts § 652 at 378 cmt. a).  The *Kaiser* court listed select examples from the Restatement (Second) of Torts § 652 as illustrations of the types of intrusions for consideration as an invasion of privacy under § 20-203: "a reporter's entering a hospital room and taking a photograph of a person suffering from a rare disease"; "'window peaking' or wiretapping by a private detective"; "obtaining access to a person's bank records pursuant to a forged court order"; or "the continuance of frequent telephone solicitations." *Id.*  The *Kaiser* court considered whether the defendants, who operated a model airplane field and noisily and continuously flew over the plaintiffs' land, had intruded upon the seclusion of the plaintiffs in the manner contemplated by Neb. Rev. Stat. § 20-203.  *See id.*  It found that Neb. Rev. Stat. § 20-203 was not "designed to protect persons from the type of alleged intrusion involved in this case." *Id.* at 562.

"Trespassing onto real property, without more, is simply not the form or magnitude of interference into a person's solitude or seclusion that would rise to the level of being highly offensive to a reasonable person, such as might be actionable under § 20-203." *Whipps Land & Cattle Co. v. Level 3 Commc'ns, LLC*, 658 N.W.2d 258, 270 (Neb. 2003),

14

658 N.W.2d at 270. Nebraska courts have also considered cases involving invasions of an individual's personal privacy. In *Sabrina W. v. Willman*, the Nebraska Court of Appeals held that an owner of a tanning salon who took nude photos of an unknowing patron had invaded the patron's privacy in violation of Neb. Rev. Stat. § 20-203. *Sabrina W. v. Willman*, 540 N.W.2d 364 (Neb. Ct. App. 1995). Conversely, in *Wilkinson v. Methodist, Richard Young Hosp.*, the Supreme Court of Nebraska "decline[d] to extend a cause of action for invasion of privacy under § 20-203" where hospital employees used a hospital computer system to retrieve a patient's insurance information and file a claim for treatment provided to the patient's daughter. *Wilkinson*, 612 N.W.2d 216 (Neb. 2000). The *Wilkinson* Court reasoned that since the hospital "accessed its own property to acquire the information" it did not violate § 20-203. *Id.* Lastly, the Supreme Court of Nebraska held, in *Polinski v. Sky Harbor Air Service*, that an employer's release of an employee's drug test results to airport authority was not violative of Neb. Rev. Stat. § 20-203 because the release was not "public." *Polinski v. Sky Harbor Air Serv., Inc.*, 640 N.W.2d 391, 398 (Neb. 2002).

In his complaint, Kimbril alleges that "[d]efendants published an article constitute [sic] intentional interference with the Plaintiff's interest in solitude or seclusion, either as to his person or private affairs or concerns, of a kind that would be highly offensive to a reasonable person in violation of Neb. Rev. Stat. § 20-203." Filing No 1-1 at 6. In order to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. 544, 555 (2007). Although legal conclusions

"can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 556 U.S. 662, 679 (2009). Pleadings that are no more than legal conclusions are not entitled to the presumption of truth. *Id.* Kimbril has not stated any factual allegations in support of his legal conclusion that Defendants violated Neb. Rev. Stat. § 20-203, and the Court finds none in the Complaint or article. The article reports alleged facts and opinions obtained from Kotzian and other websites, such as usbondsmen.com. Given the lack of facts Kimbril pled to support this cause of action and his mere recitation of the statutory language, it is not clear how such actions would intrude upon his seclusion within the meaning of the statute. Accordingly, this Court holds that Kimbril has not adequately stated a claim upon which relief can be granted as to Neb. Rev. Stat. § 20-203.

### E. The Complaint Adequately States a Claim Upon Which Relief Can Be Granted as to Defamation

This Court must next consider whether Kimbril has adequately stated a claim upon which relief can be granted as to defamation. In Nebraska, "a defamation claim has four elements: (1) false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Steinhausen v. HomeServices of Nebraska, Inc.*, 857 N.W.2d 816, 828 (Neb. 2015) (citation omitted). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* (citation omitted).

16

"The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion." *Id.* (citing *Wheeler v. Nebraska State Bar Ass'n*, 508 N.W.2d 917 (Neb. 1993)). "Statements of fact can be defamatory whereas statements of opinion—the publication of which is protected by the First Amendment—cannot." *Id.* Distinguishing between a statement of fact and a statement of opinion presents a question of law for the trial judge to decide. *Id.* In deciding whether a statement is a statement of fact or a statement of opinion, a trial judge should consider "(1) whether the general tenor of the entire work negates the impression that the defendant asserted an objective fact, (2) whether the defendant used figurative or hyperbolic language, and (3) whether the statement is susceptible of being proven true or false." *Id.*

In considering the three factors above, "context is important to whether an ordinary reader would view a statement as one of fact or opinion." *Id.* (citation omitted). In addition to the content of the communication, the Court looks to the "knowledge, understanding, and reasonable expectations of the audience to whom the communication was directed, taking cues from 'the broader setting in which the statement appears.'" *Id.* at 829 (citation omitted). Further, "[w]ords, particularly pejorative ones, often have both a literal and figurative meaning." *Id.*

Whether language is hyperbolic is relevant to distinguishing fact from opinion. *Id.* Rhetorical hyperbole, "language that, in context, was obviously understood as an exaggeration, rather than a statement of literal fact," is not actionable. *Id.* The Court's understanding of rhetorical hyperbole includes abusive epithets, vulgarities, and profanities. *Id.* Generally, name calling falls under the category of rhetorical hyperbole.

*Id.* Courts have held that "statements potentially referring to the plaintiff's mental health, such as raving maniac, pitiable lunatic[], wacko, nut job, . . . hysterical, crazy, and crank were statements of opinion" and thus not actionable. *Id.* (internal quotations omitted). Additionally, other courts have held that articles referring to an individual as a "serial killer" were statements of opinion and thus not actionable and non-defamatory. *See e.g.*, *Wilson v. Freitas*, 214 P.3d 1110 (Haw. Ct. App. 2009), *as amended* (Aug. 4, 2009) ("We conclude that the article could not rationally be understood as the author's factual assertion that Wilson was the Kaua'I serial killer or that he was very likely the Kaua'I serial killer."); *Bryant v. Cox Enterprises, Inc.*, 715 S.E.2d 458 (Ga. Ct. App. 2011) (holding an article comparing an individual to a known serial killer was a statement of opinion and thus not actionable); *Tucker v. New York Police Dep't*, No. CIV.A.08-2156 (DMC), 2008 WL 4935883, at *15 (D.N.J. Nov. 18, 2008) (news media referring to an individual as a "serial killer" was non-defamatory).

In his Complaint, Kimbril identifies at least eight published statements that he believes to be defamatory. Filing No. 1-1 at 4. These published statements include, but are not limited to, allegations that Kimbril harassed Kotzian while employed at TD, that Kimbril threatened to physically assault Kotzian, that Kimbril should be on a sex offender registry, and that Kimbril might have failed to properly report FINRA information. *Id.* Kimbril denies the truth of all of these assertions. *Id.* at 6. This Court must first ask "whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion." *Steinhausen*, 857 N.W.2d 816 (citing *Wheeler*, 508 N.W.2d 917). In considering the three factors in *Steinhausen* and the context of the publication, this Court finds that a reasonable fact finder could conclude that the above

18

published statements imply provably false factual assertions; they are not merely statements of opinion. Therefore, Kimbril has adequately stated a cause of action for defamation which will depend on the factfinder's determination of the truth or falsity of the statements contained in the article.

Additionally, Kimbril argues the article's reference to Kimbril as "[s]erial-killer level crazy" also constitutes defamation. Filing No. 1-1 at 4. In considering the three factors in *Steinhausen* and the context of the publication, this Court finds that a reasonable fact finder could not conclude that the above published statement implies a provably false factual assertion. The statement that Kimbril is "serial-killer level crazy," and likening Kimbril to a "serial-killer" (sic) is a statement of opinion, protected by the First Amendment, and is thus not actionable and non-defamatory. Accordingly, the Court holds that Kimbril has adequately stated a claim upon which relief can be granted as to defamation, with the exception of the claim that Kimbril is "serial-killer level crazy."

### F. The Complaint Does Not Adequately State a Claim Upon Which Relief Can Be Granted as to Neb. Rev. Stat. § 20-204

This Court must next consider whether Kimbril has adequately stated a claim upon which relief can be granted as to Neb. Rev. Stat. § 20-204. Section 20-204 provides the cause of action for bringing an action for invasion of privacy by placing a person before the public in a false light:

> Any person, firm, or corporation which gives publicity to a matter concerning a natural person that places that person before the public in a false light is subject to liability for invasion of privacy if: (1) [t]he false light in which the other was placed would be highly offensive to a reasonable person; and (2) [t]he actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other should be placed.

Neb. Rev. Stat. § 20-204.

Where a "Plaintiff alleges that a defamatory statement was made, Plaintiff's false-light claim [is] subsumed by his defamation/libel/slander claim and, therefore, would not be actionable." *Webb v. Franken*, No. 4:21CV3031, 2022 WL 6720970 (D. Neb. Oct. 7, 2022) (citing *Funk v. Lincoln-Lancaster Cnty. Crime Stoppers, Inc.*, 885 N.W.2d 1 (Neb. 2016) ("In order to survive as a separate cause of action, a false light claim must allege a nondefamatory statement. If the statements alleged are defamatory, the claims would be for defamation only, not false light privacy.")) "A statement alleged to be both defamatory and a false light invasion of privacy is subsumed within the defamation claim and is not separately actionable." *Moats v. Republican Party of Nebraska*, 796 N.W.2d 584, 598 (Neb. 2011).

Since Kimbril has adequately stated a claim upon which relief can be granted as to defamation, his false light claim is subsumed by his successfully pled defamation claim and is, therefore, not actionable. Accordingly, this Court grants Defendants' motion to dismiss as to the claim under Neb. Rev. Stat. § 20-204.

### G. The Complaint Adequately States a Claim Upon Which Relief Can Be Granted as to Slander

This Court must next consider whether Kimbril has adequately stated a claim upon which relief can be granted as to slander. Neb. Rev. Stat. § 25-839 provides the requirements for bringing an action for slander under Nebraska law.

> In an action for . . . slander it shall be sufficient to state, generally, that the defamatory matter was published or spoken of the plaintiff, and if the allegation be denied, the plaintiff must prove on the trial the facts, showing that the defamatory matter was published or spoken of him.

Neb. Rev. Stat. § 25-839.

Kimbril has stated, in his complaint, that the article published by Defendants contained defamatory matter. Filing No. 1-1 at 6. Defendants deny that the published

article was defamatory. Filing No. 9 at 1. As such, the question of whether the defamatory matter was published as to Kimbril is to be resolved by a fact finder. Neb. Rev. Stat. § 25-839. Accordingly, Kimbril has adequately stated a claim upon which relief can be granted as to slander.

### H. The Complaint Adequately States a Claim Upon Which Relief Can Be Granted as to Slander Per Se

Lastly the Court must consider whether Kimbril has adequately stated a claim upon which relief can be granted as to slander per se. Whether a statement is slander per se is a question of law for the court. *Hennis v. O'Connor*, 388 N.W.2d 470 (Neb. 1986). In Nebraska, the test for whether a statement amounts to slander per se has two parts. *Id.* First, "the court decides (1) whether a communication is susceptible of a particular meaning[,] and (2) whether the meaning is defamatory." *Id.* (citations omitted). Second, "it is for the jury to decide whether the statement, capable of a defamatory meaning, was so understood by its recipient." *Id.* (citations omitted).

Regarding the first prong, for a plaintiff to make a submissible case of slander per se, "the alleged defamatory statements must convey not only 'the expression of a wrong which is actionable, but also the nature of the particular wrong.'" *Id.* at 473 (citing *Hudson v. Schmid*, 272 N.W. 406 (Neb. 1937). Additionally, "[t]he language, by its nature and obvious meaning, must *falsely* charge a person with commission of a crime or subject him to public ridicule, ignominy, or disgrace." *Id.* (emphasis added).

For example, in *Nelson v. Rosenberg*, the Supreme Court of Nebraska held that calling someone a "crook" is not slander per se because the term "crook" did not "with any degree of certainty suggest the nature of the wrong done." *Nelson v. Rosenberg*, 280 N.W. 229, 231 (Neb. 1938). Additionally, telling someone, in front of others, "you're

21

crooked" and "you crooked bastard" is not slander per se because, while derogatory and disparaging, the words "crook" and "bastard" only charge a person with being illegitimate. *Hruby v. Kalina*, 424 N.W.2d 130, 132 (Neb. 1988).  Conversely, telling someone, in front of others, "you stole the money" is slander per se because it "clearly imputes to the plaintiff the crime of theft [and] [s]uch a crime in Nebraska is punishable by imprisonment and would be regarded by public opinion as a crime involving moral turpitude." *Id.* Additionally, a plaintiff saying that a co-worker had "grabbed [her] on the butt," had hit her butt with a clipboard, and had harassed her is slander per se because it "imputes . . . a crime of moral turpitude punishable by imprisonment." *Norris v. Hathaway*, 561 N.W.2d 583, 586 (Neb. Ct. App. 1997).

The article alleges that Kimbril told Kotzian, "I can [make you wear a hoodie] . . . I can get your address out of [TD's internal employee directory] and come to your house on Friday.  I'm going to zip tie you to a dining room chair, take off your shirt and dress you in a hoodie."  Filing No. 10-1 at 6, 7.  This alleged defamatory statement conveys both the expression of a wrong which is actionable and also the nature of the particular wrong. In this case, the nature and expression of the wrong is clearly alleged in the article is that Kimbril threatened to find Kotzian's residential address from TD's internal employee directory, go to Kotzian's house, zip tie Kotzian to a dining room chair, take Kotzian's shirt off, and dress Kotzian in a hoodie.  The wrong alleged in the article imputes the crimes of false imprisonment in the first degree under Neb. Rev. Stat. § 28-314, false imprisonment in the second degree under Neb. Rev. Stat. § 28-315, and kidnapping under Neb. Rev. Stat. § 28-313, which are clearly "crime[s] of moral turpitude punishable by imprisonment." *Norris*, 561 N.W.2d at 588.

Similarly, the article alleges that "Kimbril was booked . . . for sexual assault of a child," which the article alleges is "his first such offense in the state" and is categorized as "a third-degree felony under Nebraska law." Filing No. 10-1 at 3. The passage can be read as implying that despite not being convicted, Kimbril still committed the sexual assault. The passage is also susceptible of the interpretation that Kimbril has committed other similar crimes in the state of Nebraska or the same crime in other states. As such, the alleged defamatory statement conveys both the expression of a wrong which is actionable and also the nature of the particular wrong, namely the crimes of sexual assault of a child under Neb. Rev. Stat. § 28-320.01. Filing No. 10-1 at 3. Accordingly, this Court holds that Kimbril has adequately stated a claim upon which relief can be granted as to slander per se.

## III.     CONCLUSION

Kimbril has stated a claim against Defendants as to defamation (with the exception of the claim that Kimbril is "serial-killer level crazy"), slander, and slander per se. Kimbril has not adequately stated a claim as to Neb. Rev. Stat. § 20-202, Neb. Rev. Stat. § 20-203, Neb. Rev. Stat. § 20-204. Accordingly, Defendants' motion to dismiss is granted in part and denied in part.

THEREFORE, IT IS ORDERED:

1. Defendants' motion to dismiss for failure to state a claim, Filing No. 8, is denied in part and granted in part as stated herein.

Dated this 31st day of March, 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge

23